IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STEPHEN TURNER, M.D., SUSANA TURNER, on behalf of themselves and as Guardian ad Litem for minor children DAVID TURNER, DANIEL TURNER, DEBORAH TURNER, and WESTERN PARAMEDICAL SERVICES, LLC,<br><br>    Plaintiffs,<br><br>  v.<br><br>DAVID J. COOK, ESQ., COOK, PERKISS & LEW, a professional law corporation, AH BENG YEO and E.A. MARTINI, and DOES 1 THROUGH X AND EACH OF THEM INCLUSIVE,<br><br>    Defendants.<br>_____/ | No. C 01-3884 CW<br><br>ORDER GRANTING DEFENDANTS' MOTION TO DISMISS |

Defendants move to dismiss Plaintiffs' Second Amended Complaint. Plaintiffs' First Amended Complaint alleged violations of the Fair Debt Collection Practices Act (FDCPA), 15 U.S.C. § 1692; the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1961; and several State law claims. On March 22, 2002, the Court dismissed that complaint with leave to amend. Order Granting Defendants' Motion to Dismiss (March 22 Order). In this Complaint, Plaintiffs have amended their RICO claim and

continue to pursue a State law claim for invasion of privacy. Pursuant to Federal Rule of Civil Procedure 12(b)(6), Defendants move to dismiss these two remaining claims. Plaintiffs oppose the motion. The matter was submitted without oral argument. Having considered all the papers filed by the parties, the Court grants the motion (Docket # 50).

## BACKGROUND

The facts of this case were discussed in the Court's March 22 Order. They will be recounted here only as necessary to resolve the issues in dispute.

On August 21, 1998, Defendants Yeo and Martini obtained a judgment against Plaintiff Stephen Turner in excess of $1,000,000. The judgment resulted from a jury verdict after trial in which Plaintiff Stephen Turner was found to have committed "various business interference torts" against Defendants Yeo and Martini. Defendants Yeo and Martini hired Defendant Cook and his law firm, Cook, Perkiss, and Lew, to assist in collection of the judgment. Plaintiffs allege that the means used by Defendants in their effort to collect on the judgment violated RICO and constituted an invasion of privacy.

In support of their RICO claim, Plaintiffs allege ninety-four separate incidents of fraud. The alleged fraud consists of stating that a State court had ordered that any monies owed to Plaintiff Western Paramedical Services (WPS) should be turned over to Defendants. Plaintiffs contend that the turnover order, in fact, only applied to Stephen Turner, that WPS is not owned, operated or controlled by Plaintiff Stephen Turner, and, therefore, the State

2

court did not order that monies owed to WPS be turned over to Defendants. Plaintiffs contend that each time Defendants misrepresented the substance of the turnover order, they committed an act of mail or wire fraud. Defendants made this allegedly false representation in numerous letters to numerous insurance companies that were believed to be debtors of Plaintiff WPS.

Travelers Insurance Company (Travelers) was one of the insurance companies that received a letter from Defendants. Travelers interplead the contested funds in State court. In that action, WPS did not participate and a default judgment was entered against it. On July 8, 2002, WPS's motion to set aside default and default judgment was denied.[1]

In addition, Plaintiffs contend that there were multiple victims of Defendants' alleged fraudulent acts. The alleged victims of the RICO violation include Plaintiff WPS; Plaintiffs Stephen Turner, Susana Turner and their children David, Daniel and Deborah; the insurance companies who received the allegedly fraudulent communications; Plaintiff Stephen Turner's financial advisor, Robert Matthews; the Contra Costa Superior Court; and American Paramedical Services (APS).

## LEGAL STANDARD

A motion to dismiss for failure to state a claim will be denied unless it appears that the plaintiff can prove no set of

---

[1] The parties request that the Court take judicial notice of the interpleader action, WPS's motion to set aside default, and the State court's denial of that motion. The requests for judicial notice properly encompass adjudicative facts within the meaning of Federal Rule of Evidence 201. These requests are, therefore, granted (Docket ## 51, 62, 65, 67).

3

facts which would entitle it to relief. See Conley v. Gibson, 355 U.S. 41, 45-46 (1957); see also Fidelity Fin. Corp. v. Fed. Home Loan Bank of S.F., 792 F.2d 1432, 1435 (9th Cir. 1986). All material allegations in the complaint will be taken as true and construed in the light most favorable to the plaintiff. See NL Indus., Inc. v. Kaplan, 792 F.2d 896, 898 (9th Cir. 1986). Although the court is generally confined to consideration of the allegations in the pleadings, when the complaint is accompanied by attached documents, such documents are deemed part of the complaint and may be considered in evaluating the merits of a Rule 12(b)(6) motion. See Durning v. First Boston Corp., 815 F.2d 1265, 1267 (9th Cir. 1987).

Dismissal of a complaint can be based on either the lack of a cognizable legal theory or the lack of sufficient facts alleged under a cognizable legal theory. See Balistreri v. Pacifica Police Dep't, 901 F.2d 696, 699 (9th Cir. 1988).

When granting a motion to dismiss, a court is generally required to grant a plaintiff leave to amend, even if no request to amend the pleading was made, unless amendment would be futile. See Cook, Perkiss & Liehe, Inc. v. N. Cal. Collection Serv. Inc., 911 F.2d 242, 246-47 (9th Cir. 1990). In determining whether amendment would be futile, a court examines whether the complaint could be amended to cure the defect requiring dismissal "without contradicting any of the allegations of [the] original complaint." Reddy v. Litton Indus., Inc., 912 F.2d 291, 296 (9th Cir. 1990). Leave to amend should be liberally granted, but an amended complaint cannot allege facts inconsistent with the challenged

4

pleading. See id. at 296-97.

A district court has broad discretion to grant or deny leave to amend, particularly where the court has already given a plaintiff one or more opportunities to amend his complaint to allege all claims. Mir v. Fosburg, 646 F.2d 342, 347 (9th Cir. 1980); see also McGlinchy v. Shell Chem. Co., 845 F.2d 802, 809-10 (9th Cir. 1988) ("[r]epeated failure to cure deficiencies by amendments previously allowed is another valid reason for a district court to deny a party leave to amend").

## DISCUSSION

### A. RICO

Civil liability under RICO is premised on violations of one or more of the provisions of section 1962. The provisions at issue here are section 1962(c), which prohibits a person from participating in the conduct of the affairs of an enterprise through a pattern of racketeering activity, and section 1962(d), which prohibits a person from conspiring to violate the other provisions of RICO. The issue raised in this motion is whether the acts alleged by Plaintiffs constitute a "pattern of racketeering activity."

In H.J. Inc. v. N.W. Bell Tel. Co., the Supreme Court held that to show a pattern of racketeering activity, a RICO plaintiff must "show that the racketeering predicates are related and that they amount to or pose a threat of continued criminal activity." 492 U.S. 229, 239 (1989). The "relatedness" requirement is met if the predicate acts "have the same or similar purposes, results, participants, victims, or methods of commission." Id. at 240.

5

1 Defendants do not dispute that the alleged predicate acts are
2 related in that they had the same purposes, participants and
3 victims.
4     The "continuity" requirement is met when the "conduct poses a
5 threat of continued criminal activity such as when the illegal
6 conduct is 'a regular way of conducting a defendant's ongoing
7 legitimate business.'" Sever v. Alaska Pulp Corp., 978 F.2d 1529,
8 1535 (9th Cir. 1992) (citing H.J. Inc., 492 U.S. at 243).
9 "Isolated or sporadic" acts generally do not satisfy the continuity
10 requirement, see Schreiber Distrib. Co. v. Serv-Well Furniture Co.,
11 806 F.2d 1393 (9th Cir. 1986), while "ongoing schemes, numerous
12 victims and a risk of continuing illegal activity" suggest that the
13 predicate acts satisfy this requirement. Medallion Television, 833
14 F.2d at 1365; id. ("we prefer to frame the inquiry as whether the
15 acts are isolated or sporadic, on the one hand, or whether they
16 indicate a threat of continuing activity on the other").
17     Plaintiffs do not contend that the enterprise, Defendant law
18 firm Cook, Perkiss, & Lew, is conducted as a criminal enterprise.
19 See Plaintiffs' RICO Statement ¶ 7 ("Plaintiffs believe that the
20 racketeering activity is separate from the enterprise and that it
21 has not merged with the enterprise."); id. ¶ 8 ("The usual activity
22 of the enterprise is the honest practice of law."). Rather,
23 Plaintiffs argue that they have satisfied the continuity
24 requirement because they have alleged numerous fraudulent acts with
25 multiple victims. According to Plaintiffs, these multiple acts
26 directed at multiple victims show a threat of continuing criminal
27 activity.

In support of this contention, Plaintiffs rely on Cal. Architectural Bldg. Prods., Inc. v. Franciscan Ceramics, Inc., 818 F.2d 1466 (9th Cir. 1987). In Cal. Architectural, the plaintiffs were businesses and individuals who sold ceramic tile. The defendant was a manufacturer of ceramic tile. The alleged predicate acts of fraud were representations by the defendant that it would stay in business and supply the plaintiffs with tile through March, 1994. In fact, the defendant had decided to close its business by the end of October, 1993. 818 F.2d at 1467. The defendant argued that the predicate acts did not satisfy the continuity requirement because they all related to a single criminal episode, the closing of the defendant's business. Id. at 1469. The court held that the plaintiffs had sufficiently alleged a pattern of racketeering activity because they alleged "multiple fraudulent sales to . . . multiple victims" over a period of five months. Id. Plaintiffs contend that under Cal. Architectural, they have adequately plead a RICO violation because they too have alleged multiple fraudulent acts against numerous victims.

Under Cal. Architectural, Plaintiffs need not plead multiple "criminal episodes" in order to state a RICO claim. However, where all of the alleged predicate acts are part of a single scheme, the plaintiffs must allege something that shows a threat of continuing criminal activity. In Cal. Architectural, the court held that multiple, separate fraudulent sales to separate plaintiffs over a five month period was sufficient. In subsequent cases, however, the Ninth Circuit has made clear that numerous predicate acts do

7

not satisfy the continuity requirement if those acts were aimed at fulfilling a single, identifiable purpose.

In Medallion Television, for example, the plaintiff alleged that the defendants' multiple misrepresentations induced it to enter into a joint venture that ultimately failed. The plaintiff alleged that each misrepresentation made over the phone or through the mails was a predicate act for purposes of RICO. The court held that the numerous allegedly fraudulent acts did not satisfy the continuity requirement.

> All of SelecTV's assertions about the number of licensing agreements it had obtained were parts of its single effort to induce Medallion to form the joint venture in order to obtain the broadcast rights from the promoters. In essence, Medallion's allegations concern a single fraudulent inducement to enter a contract. Once the joint venture had acquired the broadcast rights, the fraud, if indeed it was a fraud, was complete.

833 F.2d at 1363-64.

Similarly, in Sever, the plaintiff brought suit against his former employers alleging that they had fired him, blacklisted him, and induced a subsequent employer to fire him after he wrote articles criticizing them and testified before Congress to their economic detriment. 978 F.2d at 1532. The plaintiff's RICO claim alleged that the defendants engaged in a pattern of racketeering activity that damaged his ability to obtain employment. The lower court dismissed the plaintiff's fourth amended complaint for failure to state a claim under RICO, on grounds, inter alia, that he had failed to allege a pattern of racketeering. 978 F.2d at 1533. The Ninth Circuit affirmed, holding that the allegations did not satisfy the continuity requirement. The Ninth Circuit

8

specifically noted that there was no suggestion that the defendants would have harmed any other Congressional witnesses or that the alleged practices had become a regular way of conducting business. Id.

In this case, the sole alleged purpose of Defendants' conduct was to redirect to Defendants sums owed to Plaintiff WPS in order to collect the outstanding judgment owed by Plaintiff Stephen Turner. There is no allegation of a continuing threat of unlawful activity once that judgment is collected. See also Religious Technology Center v. Wollersheim, 971 F.2d 364, 366 (9th Cir. 1992) (because the goal of allegedly fraudulent activity was prosecution of State court tort suit, "there was no threat of activity continuing beyond the conclusion of that suit"). Consequently, the multiple predicate acts alleged by Plaintiffs do not satisfy RICO's continuity requirement.

Plaintiffs' contention that there were multiple victims of Defendants' fraudulent conduct does not alter this conclusion. Several cases have noted that the existence of multiple victims is one indication that the alleged conduct constitutes a threat of continued criminal activity. See Medallion Television, 833 F.2d at 1363 (finding continuity requirement not satisfied because "this case involved but a single alleged fraud with a single victim"); Sever, 978 F.2d at 1536. The existence of multiple victims is probative of the threat of continued criminal activity because it is fair to infer that a defendant who has defrauded numerous individuals is likely to continue its fraudulent activity. In this case, however, Plaintiffs are not entitled to this inference

9

because the additional victims they identify are closely connected to one another and all were allegedly injured by the single course of allegedly fraudulent conduct discussed above.

Plaintiffs Stephen and Susana Turner, for example, are husband and wife and employees of Plaintiff WPS. Plaintiffs concede that Stephen Turner played a role in creating the Golden Gate Trust, which is the nominal owner of WPS. Second Amended Complaint ¶ 48. Plaintiffs Stephen and Susana Turner allege that Defendants' allegedly fraudulent acts injured them because those acts damaged Plaintiff WPS's ability to pay their salaries. Similarly, Plaintiffs David, Daniel and Deborah Turner are Plaintiffs Stephen and Susana Turner's children and they are the residuary beneficiaries of the trust which owns Plaintiff WPS. The children allege that they were victims of Defendants' allegedly fraudulent acts in that any damage suffered by Plaintiff WPS will be ultimately borne by them. These Plaintiffs do not allege that Defendants separately committed acts of fraud that injured them. Rather, they contend that the same predicate acts that injured Plaintiff WPS also injured them. These allegations do not support Plaintiffs' contention that there is a continuing risk of illegal activity by Defendants.[2]

---

[2] In fact, because the Turner Plaintiffs' alleged injuries are indirect, they do not have standing to bring a RICO claim.
 The Ninth Circuit has articulated a three-factor test to determine if an injury is "too remote" to allow recovery under RICO. Assoc. of Wash. Pub. Hosp. Dists. v. Philip Morris, Inc., 241 F.3d 696, 701 (9th Cir. 2001). First, the Court must determine "whether there are more direct victims of the alleged wrongful conduct who can be counted on to vindicate the law." Id. In this case, Plaintiff WPS is the direct victim of the allegedly wrongful conduct in that Defendants attempted to convince WPS's debtors to

1   Plaintiffs also contend that the insurance companies that
2 received letters from Defendants were victims of Defendants'
3 allegedly wrongful conduct. The insurance companies are alleged to
4 be victims of this fraud because, upon receiving letters from
5 Defendants, "these companies didn't know what to do." Plaintiffs
6 RICO Statement ¶ 4(e)(5). The Ninth Circuit addressed a similar
7 argument in <u>Medallion Television</u>. As noted above, that case
8 involved the plaintiff's allegation that it was fraudulently
9 induced into an unsuccessful joint venture. The joint venture
10 secured rights to telecast a professional boxing match. The
11 plaintiff argued that the fight promoter and the television
12 stations that broadcast the fight were also victims. The Court
13 rejected this contention, holding "the stations were not victims

---

pay monies owed to WPS to Defendants. WPS's role in this litigation attests to its ability to vindicate its rights. Second, the Court must assess "whether it will be difficult to ascertain the amount of the plaintiff's damages attributable to defendant's wrongful conduct." <u>Id.</u> This factor also favors a finding that the Turner Defendants lack standing. The value of Plaintiffs David, Daniel and Deborah Turner's residual interest in the trust that owns Plaintiff WPS is uncertain. The decrease in that uncertain value as a result of Defendants' allegedly wrongful conduct is, at the least, difficult to ascertain and, more likely, entirely speculative. Likewise, it is difficult to ascertain what portion of Plaintiffs Stephen Turner and Susana Turner's lost salary is attributable to the allegedly wrongful conduct of Defendants. The final factor that the Court must apply is "whether the courts will have to adopt complicated rules apportioning damages to obviate the risk of multiple recoveries." <u>Id.</u> Such would be the case here. If, for example, after trial on the merits, it is determined that Defendants wrongfully diverted a certain sum from Plaintiff WPS, it is not clear how much of that wrongfully diverted sum would go to Plaintiffs Stephen Turner and Susana Turner for their lost wages, how much to Plaintiffs David, Daniel and Deborah Turner for their residuary interest in the trust that owns Plaintiff WPS and how much would go to the direct victim of the fraud, Plaintiff WPS.
    Consequently, even if Plaintiff WPS had stated a RICO claim against Defendants, the Turner Plaintiffs would have no standing to pursue that claim.

11

because they got everything they had bargained for--the telecast of the fight." Medallion Television, 833 F.2d at 1364 n.5. The fight promoter likewise "got what it bargained for: it sold the telecast rights." Id.

Similarly, in this case, the insurance companies owed certain sums to Plaintiff WPS. They paid those sums. There is no evidence that they were defrauded of sums they did not owe or failed to receive the services for which they paid. Therefore, the insurance companies are not victims of Defendants' allegedly fraudulent acts.[3]

Plaintiffs also allege that Plaintiff Stephen Turner's financial advisor Robert Matthews and the Contra Costa County Superior Court were also victims of Defendants' illegal acts.

Apparently, Matthews was briefly named as a defendant in a wrongful conveyance action brought by Defendants in Contra Costa Superior Court. Matthews "provided financial advice to [Plaintiff Stephen] Turner in connection with the creation of the Golden Gate Trust." Second Amended Complaint ¶ 48. Plaintiffs state that Matthews is a victim of Defendants' unlawful activity because "Cook's theory in bringing Mr. Matthews in the case was that Matthews was supposedly a trustee to the Golden Gate Trust, which is patently false, and yet another example of Cook trying to use

---

[3] According to the Second Amended Complaint, Defendants contacted APS, a company run by Plaintiff Stephen Turner's sister and attempted to convince the manager of APS to turn over sums owed to Plaintiff Stephen Turner. The alleged damage to this victim is that "it made its dealings with [Plaintiff Stephen] Turner much more difficult." Second Amended Complaint ¶ 47. APS, like the insurance companies that received the allegedly false letters, was not a victim of wrongful conduct by Defendants.

12

wire fraud, mail fraud, and obstruction of justice as a means toward its goal of securing payment on the judgment debt." Id. ¶ 48.  In order for Matthews to be a victim of Defendants' unlawful conduct, he must suffer some detriment.  Plaintiffs have failed to allege that Mr. Matthews was harmed by his brief inclusion as a defendant in the fraudulent conveyance action.

The contention that the Contra Costa Superior Court was the victim of fraud similarly lacks merit.  Plaintiffs argue that the Contra Costa Superior Court was injured when Defendants brought an unfounded contempt proceeding against Plaintiff Stephen Turner. Suffice it to say that courts are frequently called upon to adjudicate actions that objectively lack merit.  The bringing of such an action does not constitute a predicate act of fraud for RICO purposes.

Lastly, Plaintiff WPS is an alleged victim of Defendants' allegedly fraudulent conduct.  Plaintiff WPS was allegedly victimized when parties which owed it money were fraudulently induced to turn that money over to Defendants.  One of those parties, Travelers, interplead the disputed funds in State court. In that action, the Contra Costa County Superior Court granted default judgment to Defendants Yeo and Martini, thereby holding that the turnover order entitled Defendants to monies owed to Plaintiff WPS.  Defendants argue that this judgment collaterally estops Plaintiff WPS from arguing that the letters sent to third party insurance companies were fraudulent.

Collateral estoppel applies where 1) the issue decided in the prior action is identical to the issue presented in the second

13

action; 2) there was a final judgment on the merits; and 3) the party against whom estoppel is asserted was a party to the prior adjudication. In re Moore, 186 B.R. 962, 968 (Bkrtcy. N.D. Cal. 1995). Plaintiff WPS contends that it was never served in the interpleader action, did not participate in that action, and, therefore, is not estopped from arguing here that Defendants' assertions in letters to third parties were false. However, on July 8, 2002, Plaintiff WPS moved to set aside the default judgment. That motion was denied by the Contra Costa Superior Court. Consequently, the State court has already determined that the letters mailed to Plaintiff WPS's debtors accurately informed them of the content of the turnover order and, pursuant to that order, properly required them to pay to Defendants sums owed to Plaintiff WPS. The final judgment of the State court involving the same parties and issues precludes Plaintiff WPS from contending in this Court that Defendants' letters to third party debtors were fraudulent.

Plaintiffs' conclusory allegations that Defendants' fraudulent conduct had numerous victims are not accepted as true. McGlinchy, 845 F.2d at 810 ("conclusory allegations without more are insufficient to defeat a motion to dismiss for failure to state a claim"). The allegations in the Second Amended Complaint indicate that Defendants' alleged acts of fraud had the sole purpose of collecting on the judgment against Stephen Turner. As was the case in Medallion Television and Sever, there is nothing in these acts to suggest Defendants would continue their allegedly criminal activity after the judgment was collected. Without such

14

allegations, Plaintiffs have failed to allege facts that satisfy the continuity requirement of a RICO claim.

In addition, the Second Amended Complaint fails to allege facts that suggest there were multiple victims of the alleged fraud. The injuries alleged by Plaintiffs Stephen, Susana, David, Daniel and Deborah Turner are indirect and speculative. Alleged victims Robert Matthews, APS, and the Contra Costa County Superior Court suffered no legally cognizable injury. Finally, because a State court has already determined that the letters sent by Defendants to Plaintiff WPS's debtors accurately reflected the content of the turnover order, Plaintiff WPS is collaterally estopped from contending in this action that those letters were fraudulent.

B. Invasion of Privacy

Plaintiffs also bring a claim for relief pursuant to State law. Title 28 U.S.C. § 1367(a) gives this Court supplemental jurisdiction over this claim. Pursuant to 28 U.S.C. § 1367(c), however, the Court may decline to exercise its jurisdiction if, as is the case here, "the district court has dismissed all claims over which it has original jurisdiction." The ultimate question for the Court is whether accepting or declining jurisdiction "best accomodate[s] the values of economy convenience, fairness and comity." <u>Executive Software North America, Inc. v. United States District Court</u>, 24 F.3d 1545, 1556 (9th Cir. 1994) (<u>quoting</u> <u>Carnegie-Mellon v. Cohill</u>, 484 U.S. 343, 351 (1988)). "In the usual case in which all federal-law claims are eliminated before trial, the balance of factors will point toward declining to

15

exercise jurisdiction over the remaining state-law claims." <u>Acri v. Varian Assoc., Inc.</u>, 114 F.3d 999, 1001 (9th Cir. 1997)(en banc) (quoting <u>Carnegie-Mellon</u>, 484 U.S. at 350 n.7).

There are no factors that suggest this Court is best suited to adjudicate the invasion of privacy claim. The State law claim is based on separate facts and a separate legal theory from the RICO claim addressed here. In addition, the Contra Costa Superior Court is dealing with these same parties in ongoing litigation in State court. The Court, therefore, exercises its discretion to decline jurisdiction pursuant to 28 U.S.C. § 1367(c).

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss Plaintiffs' Second Amended Complaint is granted (Docket # 50). Plaintiffs' RICO claim is dismissed on the merits and without leave to amend. Plaintiffs' State law claim for invasion of privacy is dismissed without prejudice to re-filing in State court. Judgment shall enter accordingly. Defendants shall recover their costs from Plaintiffs. The clerk shall close the file.

Dated: 8/28/02

CLAUDIA WILKEN
United States District Judge